Good morning, Your Honors. May it please the Court, my name is Stephanie Parent, and I, along with my co-counsel, Aaron Madden, at Council Table, represent the appellants in this matter. In 1994, the BLM, or the Bureau of Land Management, decided that it must provide protections for the Oregon Red Tree Bowl. It did this through adoption of the Northwest Forest Plan, which amended the relevant BLM resource management plans. This is known as the Survey and Managed Protections of the Northwest Forest Plan. It expressly provided the Oregon Red Tree Bowl. Specifically, before logging can occur, the BLM must do the surveys of the timber sale area, and at that point, if nest sites are found, they must provide a 10-acre buffer, or no-cut zone, around those nest sites. This is all before logging can proceed. And again, in 2001, the BLM amended the Survey and Managed Provisions of the Northwest Forest Plan through a formal amendment process and with supplemental analysis under the National Environmental Policy Act. In so doing, it removed 72 species from the protection of the Survey and Managed Provisions, but it again decided that it must provide these protections for the Oregon Red Tree Bowl. But then in 2002 and 2003, through an internal memo with no public scrutiny, the BLM decided to eliminate these protections for the Oregon Red Tree Bowl in its core habitat. Your Honors, these decisions are unlawful, first, because the BLM did not engage in any formal amendment process in violation of the Federal Land Policy Management Act, or FLPMA, and its own planning regulations. Second, Your Honors, the BLM did not do any further environmental analysis or disclosure to the public of the environmental effects of these two decisions. And finally, Your Honors, these decisions are arbitrary and capricious, because the BLM simply has not explained how it has reversed its position that now this species, which it decided in 1994 and again in 2001, absolutely had to have these protections, now no longer needs them. Your Honor, I'd like to start with the amendment claim under FLPMA and the Bureau of Land Management's regulations. A little bit of historical context is important to this legal claim. In 1994, the Northwest Forest Plan was initially designed to provide for the biological needs of the northern spotted owl. At its most basic level, it creates reserve areas, or blocks of land, where the owl is intended to live over the long term. Between these blocks of land are the matrix lands where all of the timber harvesting occurs. The distances on the landscape between those blocks of land was intended for an owl to be able to disperse between those and find mates and be able to exchange genetic materials for its long-term survival. The BLM recognized that those distances were far too great for the Oregon red tree bull to disperse between those blocks of reserve lands. And that's why they provided for the survey and managed protections. Those 10-acre buffers were intended to create patches of habitat for the bull in those matrix areas so that it could disperse and that in that way the BLM was going to assure the long-term survival of this species. So in 2001, when the BLM amended those provisions, the survey and managed provisions, it went through a formal amendment process. And in so doing, it removed 72 species, but not the Oregon red tree bull. It also created a process whereby it was going to review new information about each of these species each year. It's called the annual species review process. But it is simply a process. The question before this Court is answered by the BLM's planning regulations. At 43 CFR 1610.5-5, the BLM has very broadly defined when an amendment of its plan is required. That regulation says that a plan amendment shall be initiated by the need to consider monitoring and evaluation findings, new data, newer revised policy, a change in the circumstances, or a proposed action that may result in a change in the scope of resource uses or a change in the terms, conditions, and decisions of the approved plan. Your Honor, here, the action that the agency has taken, these decisions to eliminate protections for the red tree bull, meet many of these definitions of when a plan amendment is required. In particular, this is a change in the terms and conditions of the plan. As of 2001, if the BLM wanted to propose logging in the central portion of the Bowles Range, it must survey and then create the management of a 10-acre buffer. Those are conditions that must be met prior to logging. Now, after the 2002 and 2003 decisions eliminating those protections, logging can proceed without the survey and without the buffer. Therefore, the agency has changed the terms and conditions. I would like to note, because I don't believe that it was cited in our briefs, if you look in the record at ER 36 and ER 175, you can see that when it made these decisions, the BLM attached Table 1-1, which was originally found in the 2001 record of decision. In that table, the agency expressly lists every species that is protected by survey and managed and the category of its protection. These record sites I just gave you show that in the first decision, they revised Table 1-1, and they continue to call it Table 1-1, and it's dated June 2002. And again at ER 175, they revised Table 1-1. It's dated December 2003, the dates of the decisions at issue here. Now, BLM argues that it anticipated this change through the adaptive management process. But, Your Honor, first of all, this admits that they have made a change, and it begs the question of whether or not this change triggers the amendment process. Your Honor, the argument goes on further that this change is simply plan maintenance. But if you look at the BLM's regulation and how they define what plan maintenance is, it's very limited and very narrowly drawn. Excuse me. Plan maintenance is limited to reflecting minor changes in data. It's also limited to further refining or documenting a previously approved decision incorporated in the plan. Would you give me an example of something that you would characterize as just nothing more than maintenance? It's difficult, Your Honor, because it's so narrowly drawn. Do you envision anything that would, from your perspective, that would qualify as maintenance? From my perspective, I can't off the top of my head. Everything they do is always going to be a change or condition. Because the regulation is so broadly drawn, it's difficult to see what a minor change in data or what a refinement to a decision already made is. But it simply can't apply in this case, where the decision already made was clearly to protect the goal, and now the decision is to not protect the goal. I don't see how that could ever be characterized as a refinement. Well, I'm just trying to understand this active, what is it called, active management? It's called adaptive management. Adaptive management process. Right. And how it, whether it really has a role in the, it seems like it should have some. We agree. Apparently there was some agreement early on when they adopted this process that there was some kind of understanding about this process. Yes. Between environmental groups and other people who were involved in it. Well, I disagree that there was agreement. In fact, the 2001 R.O.D. was challenged. And we briefed why that challenge was never able to come to fruition. Couldn't it be that an adaptive would be instead of protecting X number of the goal, we're going to reduce it slightly, as opposed to eliminating protection? Would that be adaptive? Well, Your Honor, I think the question is that we don't believe that the adaptive there's any, the adaptive management process is a very useful management tool. And we believe the agency should be engaging in adaptive management. When BLM develops these plans, they base it on predictions and assumptions of what they think is going to provide for the long-term survival of the species. So they did establish a process where they were intended to review any new information they collected on the species. The process is fine. But then when a decision is made at the end of that process, the question is does that decision trigger further legal obligations? And I would direct the Court to the Ninth Circuit's case in Ecology Center v. U.S. Forest Service. This is the 1999 Ecology Center case. It's 192 F. 3rd 922 at 925. And in that case, the environmental organization was trying to challenge the fact that the agency, the foresters, had failed to do its monitoring that it said it was going to do. And the Court said, well, that's not a final agency action. Simply collecting monitoring information is a good management tool, and they should collect that information. You don't have a final agency action that's reviewable by this Court until you make a management decision. So the process is, there's nothing unlawful about the process per se. It's when they make a management decision that the question becomes, does that trigger an amendment process? And here it clearly does, because the Oregon Red Tree Vole, there were conditions to logging when it was protected, and now there are none. Secondly, we've argued that this changes the scope of the resource uses, which is another, in the definition of the BLM's regulation, that also would trigger a plan amendment. At bottom, when prior to the decisions that eliminated these protections for the vole, the 10-acre buffer would have eliminated certain lands from logging. It was a no-cut zone around each of the nest sites that were found. Now that condition is not there, so you're adding all of those potential 10-acre buffers back into the timber resource. So you're actually increasing it. Excuse me. And that's demonstrated in the record, ER 300, 302, and 324 to 325. When the BLM amended the survey and managed provisions in 2001, it did an analysis of what it was going to do to the timber resource. It found that with the implementation of the Northwest Forest Plan, as it was currently being implemented, they would only be able to produce 510 million board feet of timber. But when they amended the survey and managed provisions and eliminated protections for 72 species, they disclosed that the timber production, and it's an estimate, would be 760 million board feet. So by amending the Northwest Forest Plan in 2001 and removing protections, they have now increased their estimate of the timber resource by 250 million board feet. So it's really quite indisputable that there's been a change in the timber resource use, and that is another trigger for the plan amendment process, and absolutely none happened here. One trigger would be sufficient, wouldn't it? Yes, it would, Your Honor. How about the NEPA claim? With respect to NEPA, Your Honor, this Court has been very clear that NEPA, the goals of NEPA are twofold. It's to make an informed decision, and it's to involve the public in that decision. We make two arguments, Your Honor. One is that there has been a substantial change in the decision, and that is an independent trigger of NEPA analysis. And it's very similar to our argument that there's been a plan amendment here. That's requiring a supplemental environmental impact statement. Yes, Your Honor. It would be a supplement to the original 94 EIS that was done for the Northwest Forest Plan, which, of course, was supplemented in 2001 when they amended the Northwest Forest Plan by changing the survey and managed provisions. Would you distinguish the Norton v. Suha case? Yes, Your Honor. The Norton v. Suha case is not on point because there the plaintiffs were trying to argue that there was significant new information, which meant that they had to amend the plan. We do not rely upon significant new information, which is another trigger for further or supplemental NEPA analysis. And what the Supreme Court said in Suha is that once a plan has been approved, there's no further continuing action. Therefore, significant new information can't trigger supplementation. But the Court did very clearly say at 540 — excuse me, 542 U.S. at pages 72 to 73, quote, And so our argument here is that they have amended or revised it, so we have the action that now triggers the requirement for supplemental NEPA analysis. Your Honor, where an agency has decided not to do any further NEPA analysis without even conducting an environmental assessment or an environmental impact statement, the standard is one of reasonableness, not the more deferential, arbitrary, and capricious standard. And that's in the High Sierra hikers case that we cite in our brief. It's unreasonable if the agency fails to supply a convincing statement of reasons why the potential effects are insignificant. Now, if you look in the record, the agency's reasons are found at ER 51 to 52 for the And their reasons are as follows. Number one, we established a process and we followed it. Now, we've already discussed why the process is not the problem. It's the decision that gets made as a result of that process that triggers both the amendment and the NEPA analysis. Their second reason was that we expected to make changes. Now, Your Honor, I expect that my children will leave home when they're adults, but that doesn't mean I'm not going to make significant changes to my lifestyle. So mere expectation cannot substitute for looking at whether or not the decision made actually triggers the requirement for supplemental NEPA analysis. So those decisions are not reasoned explanations for why no further supplemental NEPA analysis was required. The agency also makes the argument that this is not a plan amendment, it's not a substantial change. These decisions merely implement the process or the review process that they established in the 2001 rod. Your Honor, this simply begs the question, and this Court should be familiar with this argument, especially Judge Paez. On September 21st, this Court issued its decision in Oregon Natural Desert Association v. U.S. Forest Service, in which the agency was arguing that very site-specific decisions on grazing were merely implementing the permits, known as the annual operating instructions. And the Court said on page 11846 of the slip opinion that it is the effect of the actions, not the label that must be considered. So whether or not it's implementation, we believe it's truly a plan amendment, a substantial change. But the question, and what we must demonstrate, is that we need only raise questions that there may be significant effects that result from these decisions. Now, those effects are clearly on the impacts to the species itself. It will no longer have these patches of habitat, these buffers, within the matrix land. And the original problem, that there was no connectivity or there was no ability for the vole to get from one area to the other, continues to exist. And so that will have a significant effect on the species itself. It will also impact the type of forest that will be able to be logged without these restrictions. Because the vole exists in late-successional and old-growth forests, you now are going to have more late-successional and old-growth forest logging occurring. Has logging begun at either of the sites? With respect to the two specific timber sales at issue here, the logging has not begun at Cotton Snake. The actual program logging has not begun at Cowcatcher. In order to request that this Court expedite review, the parties did work out a stipulation where the timber purchaser was able to do some limited logging in order to begin some road construction. So that was a compromise we made in order to not have the entire sale logged before this Court could hear. Which means you wish the decision to be expedited? The Court has agreed to expedite the decision, and yes. Is there a deadline for the stipulation? You know, I didn't look for it. Well, the winter is rapidly approaching, I guess. That's more of a question for Mr. Scott, but our stipulation runs, I believe, about now. And we agreed we can talk to each other again, but we reserve the right to seek emergency relief from this Court if they decide to proceed, even after argument had been heard. Okay. Did you want to save a few minutes for rebuttal? I would like to. Okay. May it please the Court, I am David Shilton. I am representing the Bureau of Land Management. And I am planning to give seven minutes of my time to Mr. Scott for the interveners. I think the case really does come down to whether it's possible for the BLM to have this adaptive management process, whereby it starts out, as it did in 2001, with a decision studied in the EIS that considered what the parameters would be for shifting these species amongst the various categories. There's over 300 species that are part of this regime. And the categories were originally established because BLM and the Forest Service had very little information about a lot of these species back in 1994. The focus had been on the spotted owl. But you've got the lichens, and you've got mosses, and you've got voles and other species. And very little was known about them. And so, conservatively, they decided, well, we'll have these extra survey and management requirements. But as information comes in, which establishes that some of these species are more common than was thought back in 1994, there needed to be a mechanism to shift the management regime. Now, it can also work the other way. If information comes in and shows that one of these species needs to go up in category to more protection, that can happen too. But mostly what happens is what happened with the tree vole here. The studies coming in were showing that these were really quite abundant. And so it was appropriate to shift from what was called the Category C to Category D, which doesn't require the pre-disturbance surveys. And then, in 2003, to remove the survey and managed protections from this one area, this central area. And the BLM regulations do allow this kind of plan maintenance without the formality of having to do a plan amendment. The BLM needs to be able to respond to incoming data like this to make these kinds of shifts. And really, with this many species, if it had to do an amendment with a NEPA process each time it shifts categories, the whole thing would become expensive. Well, this wasn't intended as a replacement of the regulation, was it? The regulation governing amendments? No, no. That still is in place, correct? That's in place. Okay, so it's the adaptive management process that may lead to some decision making. But as I understand the argument, that's fine. But if you go across the line, and it's more in the nature of an amendment, you still have to comply with the requirements for amending. Right, and so that's the question. The question is, did we cross the line here with these annual species reviews? And that's a matter of construing the BLM regulations about whether this falls in the maintenance category or the amendment category. I think BLM is given deference in its interpretation of its own regulations on this. And here it concluded that this was maintenance and not amendment. Now, as Ms. Parent pointed out, amendment is where you have a change which changes the resource use. Now, on that issue, to shift the Red Bull protection from one category to another, that's completely independent of the resource use issue. It may mean that you no longer have a 10-acre buffer on a particular sale, but you can simply reconfigure that sale to include the same amount of timber. It's not the sort of decision which impacts resource use in an area in the way that requires an amendment. Well, how about, you know, there's about five factors or five triggers. And the one that she started out with was actually number five. Did the ASRs change a term, condition, or decision of the resource management plan? Right. And it doesn't because the terms and conditions are variable. That's how it was set up in 2001. It was expressly set up so that the particular categories could be changed. So the relevant term and condition, effectively, is maintain persistence for each of these species. Now, you can maintain and keep the same level of protection for each of these species. If information, if data comes in which shows that they're more abundant and that you don't do not need a buffer requirement or a survey requirement to maintain the same level of persistence, then you can make that shift. That is not a shift. Why isn't that an amendment, though? Well. You're changing the condition, right? Only if you look at the requirement for a buffer as sort of a rigid regulatory term and condition. I think the appropriate way to look at it here is that it was just intended from the beginning that the persistence would be the standard and that the buffers could change. The requirements could change. And that's not a change in the terms and conditions. How about a complete elimination of any buffers or persistence for the red spotted? For the bull? It could happen if the data shows that they are sufficiently abundant, that the requirements for surveying are not needed, then those can be dropped for particular. When you just mentioned data there, one of the other factors or one of the other triggers was were the ASRs based on monitoring and evaluation findings or newly available data? I'm sorry, that's part of the. . . That's part of one of the triggers. Right. Well, right. A new data can sometimes lead to an amendment, but can also lead to maintenance. And so it's just. . . Wasn't this pretty substantial new data? Well, there was a lot. . . There was a lot of. . . A lot of survey evidence coming in. But I think the question that has to be asked is whether there's a substantial change in the degree of protection. And that's the standard the BLM uses. So you'd say that Trigger 5 is really the critical one here? Well, I mean, any of them can be critical, but I think that it's possible for the BLM to set up an adaptive management program where the requirements do shift without it being the sort of change that the regulation dealing with amendments refers to. And if it's not an amendment, then you do not need new NEPA analysis. Excuse me. Are the NEPA and the, I guess, Federal. . . Flip that. I can't pronounce those acronyms as well as you guys, but the Federal Land Management. . . What is it called? Federal Land Policy Management. Land Management Act. Right. Do those sort of. . . So if there is a violation of the forest. . . Of the Land Management Act, does that sort of dovetail into the NEPA claim? It does, yes. I mean, if this is something which should have been done by amendment, then by regulation you need to do at least an environmental assessment. So the two go hand in hand. And I think the Southern Utah Wilderness Association establishes that the plan itself or plan revision is the federal action. There's no other NEPA requirement unless there is a plan amendment. So that's the key question is, is there a plan amendment here? That's right. And I think it's important to keep in mind where the protections for the red people come from. This is a planning requirement. It's not a species that's endangered or threatened. It doesn't get direct protection from any statute. But BLM has decided as part of its planning under FLPMA to protect this and other species, which means that BLM has a fair amount of flexibility to shift the nature of the protections for something like the red people. And I think that undergirds the adaptive management approach that BLM has taken here and supports its reasonableness. Again, I think it would be very difficult to protect this number of species if every time there's a shift in management it did have to do with the formal amendment process. I think I've covered, as far as the questions that were raised about whether the particular decisions were arbitrary and capricious, I think there's two types of deference that one has to keep in mind here. One, again, the agency is interpreting its own regulation, gets deference there. And also, this raises primarily scientific questions about what is the significance of particular data. There can be a variety of views about the significance, but as long as the agency has reached a rational determination based on the evidence in the record, then it should be upheld. And I think the record here does show that there were a lot of studies coming in showing that red tree bull active nests were being found in over a quarter of the surveys. And for these types of – that was really the highest of any of these species, and it's really considered good evidence that the red tree bull is really pretty abundant, and that these protections, which were initially done to be conservative because very little was known about them, that these really were not needed and these shifts were not arbitrary or capricious. Counsel, assuming that your decisions are entitled to deference, what concerns me most about this case is that I guess it's in 2000, 2001, the red tree bull, it was very, very clear that an alternative was suggested that said it didn't need protection. That was rejected by the BLM. And then just a short time later, they completely take away all protections. It's hard to understand. Well, you know that alternative two in the 2001 EIS, it did cover the entire range of the bull, and the decisions that were made here just are with respect to this central area, what's called the Mesic area. And so that's one distinguishing factor from what's been done here, from what was considered in the 2001 EIS. The other difference is more data had come in showing greater abundance, first in the 2001 review and then the 2003 review. 2001 said that studies needed to be taken, and it would take several years, a period of five years, to really know about the protection. And all of a sudden, there was a change, that these studies weren't needed, that it would take a period of time to understand what the red tree bull would mean. Well, there were studies that had been completed. There were a lot of pre-disturbance studies that had come in, and they were showing so strongly that in this one area, this Mesic area, that the bulls were abundant, that it was rational to drop the protections there. So I think there have been changes from the 2001 EIS that support the result that you had here. But that wouldn't require an amendment? I mean, that's a pretty drastic change in a period of a couple of years. Well, no, I don't think so, because the possibility of that kind of change was contemplated in the 2001, January 2001 decision. It was? I missed that. Maybe that shows in the record that that drastic change, all I read was that we don't know enough, it will take a series of studies, it will take about five years to really understand these patterns, and yet, a year later, nothing was needed. Well, no, the 2001, the January 2001 rod specifically contemplated that changes could start being made as soon as the first annual species review occurred. And so none of this was a change from what was contemplated in 2001, and that this adaptive process was specifically set up there so the incoming data could result in the shifts. Thank you. I'm taking time from your colleagues. Before we sit down, actually, does the government have anything to add or any views on sort of the status of the timber sale and what's happening there? Well, they're not logging now, but I think Mr. Scott can ---- The government has no position one way or another? No. Whatever the timber committee and the plaintiffs can work out is going to be fine with us. Okay. Can you please record? I'm Shea Scott, Ford Defendant Intervenor and Appellee, D.R. Johnson, the purchaser of ---- Would you keep your voice up, please? Oh, keep it up? Thank you. Yes. One of the ---- D.R. Johnson is the purchaser of one of the sales at issue in this case, the cowcatcher case. And our firm has a longstanding relationship with Stephanie Parent, and we have an agreement to provide it's either a ten-day or two-week notice if our client wants to proceed with the sale. At this point, our client spent, I believe, about $80,000 on some road work, but no work is proceeding, and we have not certainly given Ms. Parent any notice that they're going to proceed. They would like to. They need the volume, but that's the status of the sale right now. I would like to address primarily some NEPA arguments in the very short amount of time I have. Now, this Court has a long line of cases that provide the BLM with, and the Forest Service, with authority to use supplemental information reports and other evaluation procedures for purposes of determining whether new information or changed circumstances is significant and requires a supplemental NEPA document. And that rule is set out in the Supreme Court's Marsh decision, I'm sure you're all aware of, and it's been followed in this Court as recently as the year 2000 in Idaho Sporting Congress at 222 F. 3rd, 562. And the Idaho Sporting Congress lists almost an entire page of Ninth Circuit and other circuit cases stating that rule. And so although NEPA does impose a continuing duty to supplement an EA or an EIS if there is new information, the key point is that BLM does not have to go through NEPA to analyze whether new information is significant. BLM can use memoranda or other supplemental information reports or as part of some type of internal review to make a decision of significance. And that's exactly what happened. The same question I asked your colleague. How can you look to the 2000 FEIS for support when it was unequivocal in concluding that the Red Tree Bowl, they need survey and management protection for several years to come and reliable species data would not be available for quite some time? Well, your Honor, I think it's very important to keep the annual species review process in context with the Northwest Forest Plan. The Northwest Forest Plan was accompanied by an FEIS in 1994, and in 2001 there was a record decision and a final environmental impact statement which created the annual species review process. And both of those decisions create the survey and management mitigation measures. Now, it's important to understand that BLM and the Forest Service are going through an ongoing process of collecting data, of assessing sites and bowl nest areas to continue to assess new information to make that determination. And so the key point is that the standard here is to provide a reasonable level of persistence for the bowl so that by 2001, when the annual species review process was adopted, BLM and the agencies continued to evaluate that information. So in 2001, when the annual species review was being conducted, by that time BLM had recorded over 1,000-plus bowl sites. They had charted about 582 nests, and those recorded were recent survey information that were collected up through May 2002. So there had been new information that BLM and the agencies were collecting before the annual species review change in the species of the red tree bowl was made in May 2002. And the critical point is that did not change the persistence standard and guideline under the Northwest Forest Plan that was adopted in 2001 and reaffirmed, excuse me, adopted in 1994 and reaffirmed in 2001. And if there is no change in persistence for the bowl, then the standard and guidelines haven't changed. It doesn't trigger a new NEPA document, and it doesn't trigger a plan amendment. Now I realize there is a variety of information on the bowl indicating that more information is needed and it may take time, but the truth of the matter is BLM and the agencies have been and are continuing to collect information about the bowl and upwards of 400 other survey and managed species. Well, not only that. They need information for several years to come, but the red tree bowl would need protection for several years to come. That was my question. Well, Your Honor, it's important to understand that the foundation and our overriding objectives of the Northwest Forest Plan are to provide a balance between a sustainable ecosystem and a sustainable economy of forest resources. And the survey and managed aspects of the Northwest Forest Plan and the details of the 2001 record of decision are mitigation measures. They were created primarily because of the fear of the unknown. The agencies lacked information about certain species, but these species are not threatened and endangered, Your Honor. And the ESA, the Endangered Species Act statutory scheme, doesn't even apply to many of the species at issue, such as fungi and bryophytes, which are mosses. And if I can make just one big point today, it's that the 2001 annual species review process and, again, in the 2003 annual species review process, the agencies confirmed based on recent new information through a highly educated peer review process that there was not only no further concern for the species, but the species had, based on new information they had learned, there was not only no change in the survey and managed guidelines, but the species was in much better shape than originally anticipated. And I think that's the critical point. I see my time is up, and I'm actually over. I apologize. Oh, that's okay. Thank you. Do you have any other questions? Thank you so much. We appreciate your arguments. Ms. Brenner, we've got a few. Thank you, Your Honors. I wanted to first address Judge Nelson's questions. In 2001 record of decision, the alternative, too, that they were looking at was not only to eliminate it in the year 2006, not in 2001 or 2003, but that alternative was also going to maintain all of the existing 10-acre buffers. So they were going to maintain patches of habitat. But the decisions made here actually releases all of those known sites, and what happens now is those areas are logged. And with respect to the decision, they declined to eliminate the species from protection in 2006 because alternative, too, results in substantial effects and uncertainty on the future status of the retrieval because it would provide inadequate habitat to maintain populations in all three of its distribution zones. So the government argued that, well, this is only the domestic portion of its range, but in 2001 they said they have inadequate habitat even if we maintain their known sites. The studies that were supposed to happen, which did not, had to do with population trends, population densities, and most importantly they were conducting what are called strategic surveys, which means they were trying to determine what the distribution of the vole was across its range. The only new information that they had was about two years of data, which was acquired because they did pre-disturbance surveys. That means wherever they decided to log, that's where they did the surveys. I heard Mr. Shea, excuse me, Mr. Scott, argue that they found out they're doing better than they thought they were. That's not supported by the records, Your Honor. What the ASR process documents show is that they are as abundant as they expected them to be when they adopted the 1994 Northwest Forest Plan. So in other words, where they expect to find them, they actually are finding them. That's a fairly unremarkable conclusion. Moreover, in the reserves, the late successional reserves, they are actually finding that they are less abundant than they expected them to be. You've got to wrap up, Ms. Gray. Okay, Your Honor. The government says they get deference. Nowhere in the record did they conclude this is maintenance. That's an argument made in the briefs. And the terms and conditions, the government said that that is to maintain persistence. That is the goal, Your Honor, the terms and conditions where you have to survey before you log and you have to protect the sites you find. Thank you, Your Honor. Thank you. Thank you, counsel. We appreciate all of your arguments. The matter will be submitted.
judges: D. Nelson, Thompson, Paez